**Debra SMITH, et al., Plaintiffs,**

v.

**James BARBER, et al., Defendants.**

**No. CIV.A.01–2179–CM.**

United States District Court,
D. Kansas.

Feb. 13, 2004.

994

Keith E. Renner, Lee R. Barnett, Barnett & Renner, PA, Auburn, KS, for Plaintiffs.

Allen G. Glendenning, Watkins, Calcara, Rondeau, Friedeman, Bleeker, Glendenning & McVay, Chtd., Great Bend, KS,

Chanda M. Feldkamp, David R. Cooper, J. Steven Pigg, Teresa L. Sittenauer, Fisher, Patterson, Sayler & Smith, Topeka, KS, for Defendants.

### MEMORANDUM AND ORDER

MURGUIA, District Judge.

Plaintiffs Daniel Smith, Josh Traxson, Aaron Spencer, Jestin McReynolds, Bryan Vail (the "five student plaintiffs"), Deborah Smith, Kendra Smith, Billy McReynolds, Alverda McReynolds, William "Billy" Spencer, Dennis Spencer, Mallory Sanders (the "remaining plaintiffs"), and Gayle Vail brought suit under 42 U.S.C. § 1983 alleging multiple constitutional violations and asserting numerous state law claims. Defendants to the action include the City of Altamont, Kansas, former Altamont Police Chief James Barber (the "city defendants"), Labette County, former Labette County Attorney Robert Forer, Sheriff William Blundell, Detective Scott Higgins, Undersheriff C.W. Davis (the "county defendants"), Unified School District ("U.S.D.") 506, Principal Greg Cartwright, and Superintendent Dennis Wilson (the "school district defendants").

This matter comes before the court on the city defendants' and the school district defendants' Motion for Summary Judgment (Doc. 171) and the County Defendants' Motion for Summary Judgment (Doc. 173).

### I. Facts

#### A. The Alleged Plot

On Friday, December 17, 1999, Labette County High School ("LCHS") officials learned of an alleged plot to stage an armed assault on the school by Smith, Traxson, Spencer, McReynolds, Vail,[1] and non-parties Dwayne Heiskell and Noah Van Buren. The plan had been allegedly formulated the previous evening, December 16, 1999, at the Smith's residence by the five student plaintiffs and Heiskell, and the alleged attack was to take place on Monday, December 20, 1999. The evidence is uncontroverted that Smith, Traxon, Spencer, McReynolds, and Heiskell were all present Thursday evening, December 16, when at least certain of them discussed an armed attack on LCHS, but plaintiffs contend that the conversation was a joke and the boys never in fact intended to follow through on their idea.

The next day, December 17, 1999, Heiskell and McReynolds discussed, in the presence of Van Buren, the alleged plan to attack LCHS. The parties contest the details of the conversation with Van Buren, although the record confirms the general topic. Also, at some point during that day, Van Buren was allegedly recruited to participate in the attack by sitting on a building outside LCHS and shooting people as they came out of the building.

#### B. Stacy Smith

Over the lunch hour, Heiskell and Van Buren approached teacher Stacy Smith to tell her about the alleged assault plan. Heiskell informed Stacy Smith about the conversation of the night before at plaintiff Smith's house and warned her not to come to school on Monday. Upon questioning by Stacy Smith, Heiskell described the

---

1. The record is controverted as to whether Vail was present at the time that the alleged plot was being discussed. During his post-arrest interrogation, Vail admitted he was there and relayed several details of the conversation. Spencer also confirmed Vail's presence during his own interrogation. Plaintiffs, however, cite deposition testimony from some of the five student plaintiffs who testified that Vail was not present during the discussion. Nevertheless, the resolution of this factual issue is not necessary to summary judgment because there is no contention that Vail was unaware or uninformed about the alleged plan.

discussion about attacking the school, including directly targeting several teachers. In particular, Heiskell warned Stacy Smith that McReynolds remained upset with her because she had informed McReynold's mother about his drinking.

Van Buren also warned Stacy Smith to not come to LCHS on Monday, and he told her that McReynolds had asked him to sit on the roof of the adjacent building to shoot people as they came out of LCHS. Van Buren then became very emotional and began to cry. Stacy Smith immediately thereafter reported the conversation to principal Cartwright.

## C. Principal Cartwright

Cartwright interviewed Heiskell in the presence of Stacy Smith and Van Buren. Heiskell told Cartwright that he and the five student plaintiffs had been drinking and doing drugs the night before, and they started talking about assaulting the school. According to Heiskell, they had a plan for the attack, knew who they were going to shoot, and determined where they were going to get the guns. Heiskell informed Cartwright that the boys had drawn a map of the school and then burned it. The plan, Heiskell told Cartwright, was for them to gather at the Spencer's home that Monday and then begin their attack at the end of the school where the art room was located. McReynolds, Heiskell reported, could get police uniforms for them to wear, and they were to paint their faces and wear ski masks. According to Heiskell, someone planned to drive a vehicle through the school while the others shot anyone who got in their way. Heiskell also reported that they had discussed a list of specific individuals they would shoot, including Cartwright. Heiskell also told Cartwright that he did not believe the five student plaintiffs were serious until Van Buren was approached about sitting on top of a building and shooting people as they came out.

Following the conversation, Cartwright called the Safe School Hotline to report the alleged threat.

## D. Law Enforcement Response

LCHS Assistant Principal Ken Swender called undersheriff Davis at the sheriff's office in Oswego, Kansas, to report the alleged plot to attack the school. Sheriff Blundell, detective Higgins, and Davis then left the sheriff's office and drove to LCHS in Altamont to investigate the allegation.

After arriving at LCHS, Blundell observed police chief Barber and informed him that the sheriff's office would handle the investigation. Cartwright advised Blundell, Higgins, and Davis of the plan, as related by Heiskell, to assault LCHS and target several administrators, teachers, and at least one student. Cartwright then called superintendent Wilson to inform him of the events unfolding at LCHS.

After Wilson arrived at LCHS, Blundell and Higgins interviewed Heiskell in the presence of his parents and Wilson. Heiskell informed them that he and the five student plaintiffs were at the Smith's residence the night before, doing crank and other drugs and planning the attack on LCHS. Heiskell relayed detailed aspects of the plan, including: (1) the boys planned to wear black clothing or law enforcement uniforms; (2) they had drawn a map of the school for the attack and then burned it in an ash tray; (3) Van Buren was to sit atop a building to the east of the school and shoot people as they emerged; (4) someone would drive McReynold's demolition derby car into the school; and (5) the assault was planned for Monday. Throughout the interview with Heiskell, he was crying and visibly upset.

Following the interview, Blundell and Higgins drove to Parsons, Kansas, to meet with county attorney Forer in his office.

### E. Investigation and Application for Search Warrants

Blundell advised Forer of the details of the interview with Heiskell. They also discussed the need to interview Van Buren, and Blundell contacted the Kansas Bureau of Investigation ("KBI") to request assistance in the investigation. Blundell and Higgins then returned to the sheriff's office in Oswego.

Higgins began preparing an affidavit in support of an application for search warrants. A sheriff's deputy called Cartwright to come to the sheriff's office and provide them with the details of Cartwright's interview of Heiskell, along with information about where the boys lived, and what activities they might be attending over the weekend. Cartwright also informed Higgins of a report he had received from teacher's aide Kelly Bedore. According to Bedore, Van Buren warned Bedore not to come to school on Monday. Higgins did not tell Cartwright that he was preparing an affidavit in support of search warrants.

Cartwright and Higgins did not discuss Heiskell's credibility while the two were at the sheriff's office. Cartwright already had informed Higgins that Heiskell had lived in Cartwright's home for a period of time until Cartwright told him to move out. Higgins also was aware that Heiskell had three prior juvenile convictions for felony theft, residential burglary, and misdemeanor criminal damage. Higgins was not aware at the time he was preparing the affidavit that Heiskell was diagnosed with attention deficit disorder ("ADD") or that he took medication to remedy the symptoms.

Later that evening of Friday, December 17, Higgins called Heiskell to conduct a second interview by telephone. Higgins asked Heiskell to describe the police uniform, which was to be worn during the attack, that he had observed the previous evening while in Smith's bedroom. Heiskell told Higgins that the shirt was light blue and the pants were a dark blue or black, which is consistent with the colors of the uniforms of the Labette County Sheriff's Department. Heiskell described the badge as a rusty bronze color and oval shape with wings protruding from the top, which is not the shape or color of the badge worn by the sheriff's department deputies.

At approximately 10:30 p.m., KBI Senior Special Agent Robert Beckham interviewed Van Buren in Independence, Kansas. Beckham reported to Higgins that Van Buren had told him the following:

a. that Jestin McReynolds had approached him just prior to 4th period (approx. 11:00 am) at the high school [LCHS];

b. that McReynolds said that [he] and a couple [of] guys had a plan and if Van Buren was not in on the plan he should not come to school on Monday;

c. that during auto mechanics class, Jestin McReynolds approached Dwayne Heiskell and asked whether Dwayne Heiskell was in on the plan; and

d. that he and Dwayne Heiskell went to LBHS [ (LCHS) ] Principal Greg Cartwright and told him what was going on and that Van Buren then found Ms. Smith, a teacher, and told her what Jestin McReynolds had told him.

Based upon that information, Higgins completed an application for search warrants. In support of the application, Higgins signed an affidavit that stated the following:

1. That I am a detective for the Labette County Sheriffs Department.

2. That on December 17, 1999 at approximately 2:15 p.m. myself, Labette County Sheriff William Blundell, and Undersheriff Clifford Davis responded to Labette County High School to meet with school officials regarding a report of possible criminal activity. Upon arriving, we met with school principal Greg Cartwright, U.S.D. 506 Superintendent Dr. Dennis Wilson, and Altamont Chief of Police Jim Barber. Those officials briefly advised us that a student at the school, Dwayne Heiskell had learned of an ongoing conspiracy involving five other students to shoot and kill several teachers and one student.

3. Sheriff Blundell and I, upon receiving the above information, then interviewed Dwayne Heiskell. Present in the room during the interview were myself, Sheriff Blundell, Dwayne Heiskell, and Dwayne's father, Doug Heiskell. During the interview both Dwayne Heiskell and his father Doug Heiskell were visibly emotionally upset. Dwayne Heiskell sobbed during most of the interview, and his father Doug Heiskell was visibly crying near the conclusion of the interview. During the interview, Dwayne advised us as follows immediately below.

4. On Thursday evening, December 16,1999, Dwayne went to the residence of Daniel Smith, which is located at 1116 13,000 Road, Altamont, Labette County Kansas. Upon arrival, he went to Daniel Smith's bedroom where a small party was going on. Present in Daniel Smith's room were the following individuals: Jestin McReynolds, Josh Traxson, Bryan Vail, Aaron Spencer, and Daniel Smith. All five individuals attend Labette County High School. According to Labette County High School Principal Greg Cartwright, the five individuals named above are known to associate with one another. During the party, the five individuals were drinking alcoholic beverages, and consuming unknown substances which Mr. Heiskell believed to be methamphetamine and crack cocaine.

5. During the party, the five individuals discussed a plan to shoot and kill several Labette County High School teachers and one student. The targeted administrator, teachers, and student were: Principal Greg Cartwright, teachers Linda Henry, Stacy Smith, Judy Purcell, Myrna Seyfert, Dale Skolaut[,] Gary Semonick, and student T.J. Lamb. Dwayne Heiskell advised us that during the course of the party, he was solicited by the five to participate in their planned assault. Heiskell declined the invitation. Heiskell also advised us that ... [during] the party, he observed what he believed to be a 9 millimeter handgun, an SKS assault rifle, and a sawed off shotgun all belonging to Jestin McReynolds, as well as several .22 caliber rifles and handguns belonging to Daniel Smith. Heiskell also advised observing one police type uniform which he believed Jestin McReynolds had brought to Daniel Smith's bedroom. Jestin McReynolds is the son of Labette County Sheriff's Office Reserve Deputy Billy McReynolds. Reserve Deputy Billy McReynolds has been a reserve deputy for over ten years. Reserve deputies are routinely issued several uniforms which they are allowed to keep in their personal possession. Jestin McReynolds resides with his mother and father, Reserve Deputy Billy McReynolds, at 401 South Gartner, Altamont,

Kansas. Heiskell also observed a black ski mask, black shirt, a pair of black pants, and a map drawn of the school with written notations describing the planned assault. Dwayne Heiskell further advised us that the five advised him that one of the conspirators would wear the police type uniform, one conspirator was to wear the all black clothing and ski mask, and the remaining conspirators were to wear face paint and bandanas around their faces. During this portion of the discussion the five also stated that they intended to enter Labette County High School, where they planned to shoot and kill the previously mentioned school administrator, teachers, and student, and anyone else who happened to be in the hallways at the time. Dwayne Heiskell was told by the conspirators that the original plan was to implement their assault on Friday morning, December 17,-1999. Dwayne Heiskell was further advised by the conspirators that the assault plan was postponed until this coming Monday morning, December 20,1999. Dwayne Heiskell advises, that no explanation was given by the five as to why their plans had been postponed.

6. On the evening of December 17[,] 1999 I conducted a follow-up interview with Dwayne Heiskell by telephone. During the interview I asked him to describe the police uniform he had observed the previous evening while in Daniel Smith's bedroom. Heiskell told me that the shirt was light blue in color and the trousers were a darker blue or possibly black. When asked if he recalls seeing a badge, Heiskell said that he was unsure, but that he thought the badge may have been "rusty bronze colored" and oval shaped possibly with wings protruding from the top. Reserve Deputies for the Labette County Sheriffs Department are issued the same uniform worn by full time deputies, which consists of a light blue shirt and darker Frenchblue trousers, which is consistent with the description of the uniform observed by Heiskell. The badge issued to deputies is silver and star shaped; which is inconsistent with Heiskell's recollection.

7. During their discussion of the conspiracy in Heiskell's presence, the five referred to the above mentioned hand-drawn map containing written notations, which the five destroyed by fire after that portion of their conversation had concluded. Specifically, Heiskell advised us that the map was destroyed by placing it in an ashtray located in Daniel Smith's bedroom and setting it on fire with a lighter.

8. During my discussions of the matter with Principal Cartwright, I was advised by him that Assistant Principal Ken Swender had been told by Swender's daughter, Kelly Bedore, who is a teacher at Labette County High School, that on the morning of December 17,1999, Bedore had a conversation with Heiskell and student Noah Vanburen as to what Vanburen wanted for Christmas. Vanburen told Bedore that he thought his mother was going to get him a shotgun. Vanburen also told Bedore that she should not come to school on Monday morning, December 20,1999[,] because Vanburen liked her too much. During my interview of Heiskell, he told me that this morning, December 17, 1999, while attending school, he was privy to a conversation between conspira-

tor Jestin McReynolds and Noah Vanburen, during which conversation Vanburen was briefed on the planned assault and asked if he wished to participate. Vanburen declined the invitation. According to school Principal Greg Cartwright, Vanburen is a friend of the conspirators.

9. On December 17, 1999, Senior Special Agent Robert Beckham of the Kansas Bureau of Investigation, drove to 2017 Cherry Hill Road, Independence, Kansas, to speak with a Noah W. Vanburen. At approximately 1[0]:30 p.m., Agent Beckham conducted an interview with Noah Vanburen. Noah Vanburen stated the following information:

a. Noah Vauburen stated that Jestin McReynolds approached him on December 17, 1999, just prior to fourth period (approximately 11:00 a.m.) near a water fountain at Labette County High School. Jestin McReynolds stated to Vanburen that he and a couple of guys had a plan, and if Vanburen was not in on the plan, then he should not come to school on Monday, December 20, 1999.

b. During auto mechanics class, Jestin McReynolds approached Dwayne Heiskell and asked whether Heiskell was in on the plan. Vanburen stated that then he and Dwayne Heiskell went to Principal Cartwright and told him what was going on[.] Vanburen then went and found Ms. Smith, who is a teacher, and told her what Jestin McReynolds had told Vanburen.

10. Dwayne Heiskell is known to have previously been adjudicated as a juvenile offender in Labette County Case No. 98–JV–131 PA, for the offense of felony theft, and in Labette County Case No. 97–JV–136 PA for the offenses of residential burglary and misdemeanor criminal damage.

11. Jestin McReynolds is a white male, born 2/8/82, and resides at 401 S. Gartner, Altamont, Kansas. This residence is described a yellow frame one story house located on the southeast corner Fourth and Gartner Streets in Altamont, Kansas.

12. Daniel Smith is a white male, born 9/24/82, and resides at 1116 13000 Road, Altamont, Kansas. This residence is described as a white two story wood frame house.

13. Josh Traxson is a white male, born 2/15/82, and resides at 504 E. 5th Street, Altamont, Kansas. This residence is described as a green one story wood frame house.

14. Aaron Spencer is a white male, born 7/5/82, and resides at 1004 E. 7th Street, Altamont, Kansas. This residence is described as a gray one story wood frame house.

15. Brian Vail, a.k.a. Brian McElroy, is a white male, born 2/10/82, and resides at 200 Main, Valeda, Kansas.

16. During the execution of these search warrants, I believe that law enforcement personnel will encounter the following conditions:

a. The residences will be occupied by one or more individuals whom are reasonably believed to have immediate access to firearms or other weapons capable of inflicting great bodily harm or death.

b. Some of the evidence sought by this warrant is by its nature easily destroyed. There is no access to the areas of their several residences where the evidence sought is probably located, from the outside, to prevent the destruction of said evidence.

c. That the normal "knock and announce" procedure will only provide warning to one or more of the occupants so that they may possibly arm themselves and/or destroy some of the evidence sought.

17. For the reasons stated in the above paragraph, your affiant respectfully requests that law enforcement personnel be allowed to make entry to the several residences sought to be searched without first knocking on the door and announcing their authority.

Labette County District Court Judge Robert J. Fleming reviewed the application and affidavit and issued the search warrants.

## F. Execution of Search Warrants

The Labette County Sheriff's Office began executing the search warrants early in the morning of December 18, 1999. KBI Senior Special Agents John Kite and Terry Morgan and Special Agents Tim Holsinger and Beckham, alongside Kansas Highway Patrol Troopers Stan Veatch, Scott Grasl, and Brian Newton assisted in the operation.

### 1. The Smith's Residence

Officers entered the Smith's residence at 1:31 a.m. Smith, Traxon, and Sanders were all in Smith's upstairs bedroom; Traxon was asleep and Smith and Sanders were talking. Upon hearing the officers' entry, Smith grabbed a safe containing marijuana and money and attempted to flee from his bedroom by exiting through the window

onto the roof of the house. Officers that were outside the residence observed Smith's exit and apprehended him at gunpoint.

Grasl entered Smith's bedroom after Smith had fled through the window. Grasl, his gun drawn, forced Sanders to the ground, handcuffed her, and performed a brief search of her. Due to Traxson's intoxication, he did not immediately awake and officers cuffed him and transported him downstairs before he awoke.

Daniel Smith's sister, Kendra Smith, asleep in her bed in a space outside Daniel Smith's room, heard the noise downstairs and attempted to walk over and turn on the light. Sheriff's Deputy John Reed pushed her head down, spun her 180 degrees, and pushed her to the ground. When Reed spun Kendra Smith, her head struck the bannister at the top of the stairs. Kendra Smith suffered a cut on her face as a result, which was treated with soap and peroxide at the Smith's residence. Kendra Smith later went to the hospital to have the cut treated; she did not require stitches.

Officers seized the following items from the Smith's residence: marijuana, narcotic pills, a marijuana pipe, 2 blue pills, $419 cash, a set of triple beam scales, a jar containing marijuana, smoking devices, and straws. Officers also seized several guns and ammunition, which were kept in a locked gun cabinet and for which Debra Smith, Daniel Smith's mother, held the key.

Officers arrested Traxson and Daniel Smith.

### 2. The McReynolds's Residence

At 1:35 a.m., an officer knocked on the door of the McReynolds's residence, and Billy McReynolds, Jestin McReynolds's fa-

ther, answered. McReynolds was lying on the couch at the time. Officers handcuffed Jestin McReynolds and placed him at the kitchen table while they searched his room. Officers seized multiple guns and boxes of ammunition, Billy McReynolds's reserve deputy uniforms and identification, and black gloves and clothing found in Jestin McReynolds's car.

Officers arrested Jestin McReynolds.

### 3. The Spencer's Residence

At approximately 4:00 a.m., Stammer called the Spencer's residence and asked William Spencer, Aaron Spencer's father, to meet him at the door. William Spencer opened the door, and officers entered the residence and located Aaron Spencer's room. Davis had called Barber and asked him to meet the officers at the Spencer's residence, and Barber stood just inside the front door during the search.

Officers handcuffed and arrested Aaron Spencer and seized several guns and boxes of ammunition.

### 4. The Vail's Residence

At approximately 7:00 a.m., officers executed the search warrant on the Vail's residence by forced entry. Bryan Vail was asleep on a couch in the front room, and Gayle Vail, Bryan Vail's mother, was also present in the room. Officers seized marijuana and several items of marijuana-related paraphernalia, which were found in the front room, along with a shotgun and a long, black coat.

Officers arrested Gayle Vail for marijuana possession and also arrested Bryan Vail.

### G. Interrogations of the Five Student Plaintiffs

On December 18, 1999, Stammer led the interrogations of each of the five student plaintiffs at the sheriff's office. Stammer recorded and had transcribed four of the interrogations, and he prepared a report summarizing his interrogation of Vail.

Stammer and Fire Marshal Kevin Kitterman questioned Smith. Smith acknowledged that the conversation had taken place about driving cars into LCHS, running over people, and shooting people. Smith testified, however, that he also told Stammer and Kitterman that the conversation was a joke.

Stammer and Kitterman questioned McReynolds. McReynolds stated that the boys talked about attacking LCHS on Monday by driving a vehicle into the school, shooting people, and setting off bombs. McReynolds also told Stammer that the conversation was meant to be a joke.

Stammer and Kitterman questioned Traxson. Traxson stated that the boys all had access to guns, and that they had talked about getting guns from their homes and then meeting at the Spencer's residence on Monday before proceeding to LCHS to shoot people and set off a bomb. According to Traxson, McReynolds talked about using his demolition derby car in the attack on LCHS. Traxson also told Stammer and Kitterman that he thought the conversation was a joke.

During Spencer's interrogation, he told Stammer and Kitterman that Traxson, McReynolds, Smith, Vail, and himself began talking about an attack on LCHS, which Heiskell joined when he arrived at the Smith's residence. Spencer stated that McReynolds drew a diagram of the school and described the routes for an attack on LCHS. Spencer admitted that the boys had talked about weapons they would use and making bombs for the attack, and he reported that Debbie Smith let them have access to the weapons in the Smith's residence. Spencer also indicated that the conversation was meant as a joke.

Stammer and Kitterman interrogated Vail, and Stammer drafted a report summarizing the conversation. Vail stated that he was at the Smith's residence until 8:00 p.m., and that the boys talked about shooting someone. Vail also stated that McReynolds talked about having Van Buren sit on top of a building outside LCHS and shoot people as they emerged from the school. Vail then stopped talking and refused to make a statement.

### H. December 20, 1999

On December 20, 1999, Forer filed juvenile complaints in Labette County District Court against McReynolds, Traxson, Vail, Smith, and Spencer, charging each with eight counts of conspiracy to commit first degree murder.

The same day, Higgins interviewed Heiskell for the third time at LCHS. Heiskell stated the following to Higgins:

a. he was at Daniel Smith's house Thursday night, December 16.

b. The boys were drinking and talking about shooting it up at school.

c. All were smoking marijuana.

d. Heiskell spoke of how it would be fun to drive down the hall in a car.

e. Jestin McReynolds drew plans to put a ram on his car.

f. Jestin McReynolds then drew a map of the school, marking front and rear doors and drew McReynolds' truck and Heiskell's car with arrow to where they would meet in the hallway.

g. Everyone was assigned an entrance to come in the school, meet in the middle where cars were then start shooting up the school.

h. Heiskell saw [a] small pistol and [a] rifle with a wooden stock, and a scope on a bolt action in the corner.

i. Jestin McReynolds said he had access to a sawed off shotgun, an SKS rifle and a 9 mm handgun from his dad.

j. Aaron Spencer did not say much.

k. Bryan Vail said he would get the sawed off shotgun and wear [the] police uniform from Jestin McReynolds' dad.

l. Josh Traxson wanted to shoot up the teachers and . . . [T.J.L.].

m. Josh Traxson mentioned a flame thrower.

n. Bryan Vail said was going to hook up with a guy from Wichita who could get automatic weapons.

o. Daniel Smith usually had a key to the gun cabinet.

p. Heiskell believed it was more than just talk and left.

q. Friday morning, Dwayne Heiskell became angry when Jestin McReynolds approached Noah Van Buren and asked if he would sit on the roof with a rifle an pick people off as they ran outside once the shooting began.

r. Noah declined involvement.

s. Jestin McReynolds asked Noah and Dwayne Heiskell to meet at Aaron Spencer's at noon.

### I. Detention, Bond Hearings, and Jail Conditions

On December 21, 1999, a detention hearing was conducted in Labette County District Court, and the court ordered the five student plaintiffs to remain in custody.

On January 3, 2000, a bond hearing was held in the cases against Smith, Spencer, Vail, and McReynolds. Van Buren testified that McReynolds approached him in the hallway at LCHS on the morning of December 17, 1999. According to Van Buren, McReynolds asked: "Are you in on it?" When Van Buren asked him what he

was talking about, McReynolds told him that some people were going to shoot up the school and that if Van Buren wasn't going to participate then he shouldn't come to school on Monday. Van Buren testified that he believed McReynolds was serious, and also learned later that Heiskell believed that the threat was serious.

On January 29, 2000, officials transferred the five student plaintiffs from the Juvenile Detention Center in Girard, Kansas, to the Labette County Jail in Oswego, Kansas. Blundell placed the five student plaintiffs in the same cell on the bottom floor of the jail. Blundell testified that he had the five student plaintiffs placed in that cell because it was the only location that would satisfy the judge's order that juveniles be housed apart from the adult inmates.

The cell is a brick room 28 feet by 18 feet in size and furnished with five bunks, a shower, a water fountain or sink, and a toilet. Jail officials provided the five student plaintiffs with mattresses, blankets, towels, three meals a day, and cleaning supplies. The cell also contained a television with cable TV. Some of the five student plaintiffs also contend that the cell contained a number of gnats, ranging from 20 to McReynolds's estimate of 632, although he stated he never actually counted them. Officials took the five student plaintiffs outside to an exercise yard two or three times, depending upon the date of their release.

Traxson was released from Labette County Jail on February 8, 2000, on $25,000 bond and house arrest. Smith, McReynolds, and Spencer were released on February 14, on $25,000 bond and house arrest. Vail was released on February 18, on $25,000 bond and house arrest.

As a condition of their release, none of the boys was allowed to have any contact with LCHS.

## J. Heiskell Recants Portions of His Allegations

On February 6, 2000, Heiskell told Forer that portions of his previous statements to law enforcement about the alleged attack were not true. Specifically, Heiskell stated that the drawing made was of a truck rather than a map of the school, there were no guns or clothing present during the discussions, and the guns were in the gun cabinet.

Forer testified that he was unsure whether Heiskell's initial allegations or his revised statements were untrue. Nevertheless, Forer concluded that the evidence was not sufficient to prosecute the five student plaintiffs, and he dismissed the charges of conspiracy to commit first degree murder on April 14, 2000.

## K. Suspension of the Five Student Plaintiffs

Law enforcement officials provided Cartwright with copies of the five student plaintiffs' statements made during their respective interrogations, detailing their conversation of December 17, 1999. After Forer dropped charges against the five student plaintiffs on April 14, the prohibition against their contacting the school also was released. However, Cartwright concluded that it was in the best interests of the five student plaintiffs and LCHS to suspend the five student plaintiffs for the remainder of the school year.

On April 17, 2000, Cartwright sent a notice to Smith, Vail, Spencer, and McReynolds advising them that he was placing them on short term suspension effective through April 28, 2000. He also sent them a notice advising them of his intent to suspend them for the balance of the school year and advising them of their right to contest that recommendation during hearings scheduled for April 27 and 28, 2000. The April 17, 2000, correspondence to each

of the boys included a separate summary sheet which outlined three options available to the boys concerning the proposed action and also included copies of the Student Suspension and Expulsion law, K.S.A. 72–8901, *et seq*, as well as the regulations of the Board of Education of U.S.D. 506 relating to due process hearings for students.

The notices were not mailed to Traxson. While the five student plaintiffs were confined, Cartwright spoke with Traxson and his father and informed them that Traxson had two options: proceed with a suspension hearing or waive the hearing and participate in an independent study course so that Traxson could complete his credits and receive his diploma at the end of the year. Traxson chose to pursue the independent study program, and he and his father signed a waiver of the right to a hearing on his proposed suspension in exchange for participating in the program.

Wilson presided over the suspension hearings for McReynolds, Smith, Spencer, and Vail. McReynolds, Smith, and Spencer appeared at the hearing with one or more parents and their respective attorneys. In each instance, the boys agreed to the proposed suspension with the concurrence of counsel although, in each instance, the boys denied any wrongdoing on their part.

Vail appeared at the hearing but was not represented by counsel, although he testified that he understood that he had the right to an attorney at the hearing. Vail attended the hearing with his grandfather, Archie McElroy, with whom he lived. Vail did not agree to the suspension. Vail was afforded the opportunity to present evidence at the hearing, and Wilson advised him of his right to appeal the decision of the hearing officer to the school board or its designee.

Wilson accepted the suspension recommendation for each of the boys, and he mailed copies of his determination to each

of them the following week. None of the boys filed with the school district an intent to appeal.

## L. Charges Against Sanders

A LCHS dance took place the evening of December 18, 1999. Sanders and Kendra Smith attended the dance together. Heiskell, Van Buren, and Josh Gann also were present.

Shortly after arriving, Sanders observed Heiskell and walked over to confront him. Sanders called Heiskell "a fucking narc," and a "fucking liar," and accused him of "ratting out his friends." At some point during the argument, Sanders pushed Heiskell, although she testified that it was in response to Heiskell's threatening gesture. LCHS teacher Warren Milks escorted Sanders and Smith out of the building and asked Altamont police officers at the school to remove the two from the dance.

Heiskell, Van Buren, and Gann drafted statements to Stammer reporting the incident. In his statement, Heiskell expressed his concern that Sanders would gather several people to attack Van Buren and himself. Stammer summarized their accounts of the incident in a report to Forer. On January 19, 2000, Forer filed a juvenile complaint against Sanders charging her with aggravated intimidation of a witness.

Stammer drafted another report detailing an incident involving Sanders and Charla Bowshier, a LCHS student, that took place on January 27, 2000. Swender informed Stammer that there had been a fight between Sanders and Bowshier at LCHS. Stammer further reported the following:

I interviewed Charla and she told me that she had been taking a lot of guff from Mallory since the five boys from LCHS were arrested for conspiracy. She said that Mallory had asked her if

she had made a statement against them and that she had told her it was none of her business. She went on to say that Mallory had told her that she was going to kick her ass and beat her ass a number of times. She also [sic] that Mallory had caught her in the hall and yelled at her about lying about the boys.

Apparently Charla wrote a statement to school officials about Brian Vail threatening her. Charla told me that Mallory had mentioned the statement to her when she threatened to kick her ass and also to come to Mound Valley to kick her ass.

On the morning of the fight Charla said she was trying to ignore Mallory but she kept talking about her telling the others on the bus that Charla stunk and that she was a liar[.] Charla said that she finally had had enough of it and retaliated by hitting Mallory and they then got in a fight. School officials broke up the fight and the girls were suspended for three days each for fighting.

During the interview Charla told me that Mallory had come to Mound Valley to beat her up on the 17th of January, 2000. Charla said that Mallory and Kendra Smith came to Mound Valley and went to the house of a friend named Andrea Fullerton just a block north of Charla's house. Charla said that Andrea called her on the phone and said that Mallory and Kendra Smith were there and that they wanted her to fight them at the [M]ound Valley grade school. Charla said that Andrea told her that the girls had a broken baseball bat and rolls of quarters (apparently to hold in their fists). Charla told Andrea to tell them that she was not home and she went outside and did so and they left. Charla said that the girls later drove by her house slowly and honked the horn.

This followed an argument on the bus that day during which Mallory told Charla that her and Kendra were going to come to Mound Valley and beat her up. It was also during the same argument that Mallory asked Charla if she had written a statement about the boys and said she was going to kick her ass. Charla feared the girls were going to beat her up and that the bat and roll quarters were going to be used against her and that was the reason she told Andrea to tell them she was not at home.

Charla also said that on about the 10th of January, 2000 Mallory had caught her in the hallway and said what's your fucking problem bitch? Charla said that Mallory then said the judge told her that she had written a statement about the boys and that she ought to kick her fucking ass right now.

I later interviewed Mallory Sanders and she told me that she was talking to Bret Seager and Charla just hit her for no reason. She stated that she had not talked to Charla at all on the bus that day and that she had not provoked her. She also said that she was seated next to Bret Seager and he could tell if she said anything or not.

Mallory said that Charla invited her to Mound Valley to fight about two weeks prior to that day. And that she had asked Charla if she made a statement against the boys and then called her a liar. She also told me that she has a real problem with people running their mouths abut [sic] the boys being guilty. Mallory got tired of talking with me and asked her step dad if they could go home.

Next I talked with Bret Seager and he told me that he was seated next to Mallory and that he heard Mallory say Charla stinks and that she hates her and wants to fight her. He said that she was saying this to the people in the back

of the bus and that she also flipped Charla off from behind her.

Bret went on to say that Charla was trying to ignore Mallory and that she did that until they were off the bus and the fight started. Next I spoke with Jacob Bond of 343 15000 rd Mound Valley. Jake told me that he was seated in the seat between Charla and Mallory and that Charla was trying to ignore Mallory and that the whole deal started just before getting to school on the west side of Altamont. He did not see the fight that day.

I then spoke with Andrea Fullerton, Andrea told me that she was seated next to Charla on the bus and that Charla was trying to ignore Mallory. She said that after they got off the bus Charla snapped and the girls started fighting. Andrea also told me that about two or three weeks prior, on the bus Mallory had asked Charla if she wrote a statement about the boys and she answered yes and that it was about Brain Vail and that he threatened to kill her. She said that Mallory then said "You mouthy bitch I'll kick your ass. Be at your house". She said later that day Mallory and Kendra showed up at her house and told her they were there to fight Charla and told her to go call Charla and tell her they were there and to meet them at the Mound Valley grade school. Andrea did so and then told the girls that Charla was not home, at Charla's request. She said that Kendra pointed to the bat and said that it was not for Charla it was just broken. She said the girls then left.

A statement obtained from teacher Mr. Ybarra, by Ken Swender said that he heard Mallory say to Charla " 'You fucking bitch you're going to die" and "You fucking whore you're going to die" on the way into the office.

Teacher Shane Holtzman's statement also reflected that Mallory had said your [sic] going to fucking die bitch.

The last person I interviewed was Linda Henry. Linda is also Vice Principle at LCHS. Linda told me that after Mallory was brought to her office she gave her a few minutes to cool down and then spoke with her about what happened. She said that Mallory stated "After this is over I'm going to take care of her". [A]nd when Mallory asked if Charla was in the office she was ... told no she then said "That's too bad".

Sanders further testified that she had gotten into a fight with Bowshier because she heard that Bowshier had filed a complaint against Vail.

Assistant County Attorney Kenley Thompson filed a juvenile complaint against Sanders for aggravated intimidation of a witness.

## II. Legal Standards

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue of material fact" and that it is "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve

the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Analysis

### A. Unlawful Search of Homes Without Probable Cause [2]

All plaintiffs bring claims against all defendants for unlawful search of plaintiffs' homes without probable cause.

### 1. Barber, Search Warrant Execution

To prevail under § 1983, a plaintiff must establish that a defendant "acted under color of state law and caused or contributed to the alleged violation." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir.1996). Moreover, "the plaintiff must show [that] the defendant personally participated in the alleged violation." *Id.* (citing *Bennett v. Passic*, 545 F.2d 1260, 1262–63 (10th Cir.1976)).

■ Barber contends that summary judgment should be granted as to plaintiffs' Fourth Amendment claim against him for unlawful search because he was not present at any of the plaintiffs' homes except the Spencer's, and because he did not participate in the search of the Spencer's home, instead only standing inside the home while sheriff's deputies searched. Plaintiffs' response is almost entirely dedicated to arguing that Barber was involved in the *application* for search warrant, as well as alleging multiple unsupported and immaterial character attacks on Barber.

2. The court notes as a preliminary matter that law enforcement officials did not search the Traxson's residence because they found and arrested him in the Smith's residence. Traxson alleges no possessory interest in the Smith's residence; therefore, the court dismisses his claim against all defendants for unlawful search without probable cause. *See*

*United States v. Erickson*, 732 F.2d 788, 790 (10th Cir.1984) (" '[O]ne who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation or privacy by virtue of this right to exclude.' ") (quoting *Rakas v. Ill.*, 439 U.S. 128, 143–44 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)).

The court reminds plaintiffs that it already dismissed their claim against Barber for unlawful application for a search warrant. *See* March 22, 2002, Court Order (Doc. 48); Pretrial Order (Doc. 167).

With regard to the Spencers, they allege only that Barber was present while the home was searched. However, Barber cannot be found liable for his mere presence at their home; rather, they must show that he personally participated in the search that allegedly violated their Fourth Amendment rights. *See Jenkins,* 81 F.3d at 995. The court therefore dismisses the Spencers's Fourth Amendment claim against Barber for unlawful execution of a warrant. As the remaining plaintiffs have not even raised a factual allegation that Barber was present at their homes, the court dismisses their same-styled claim against Barber as well.

## 2. The City of Altamont, Kansas, Search Warrant Execution

■ A. municipality may not be held liable under § 1983 under a theory of respondeat superior. *Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, municipal liability may result only from the enforcement of a municipal policy or custom. *Id.* A municipal policy may be established by a single edict or act by a municipal official with final policy making authority. *Id.* Where a municipal officer has committed no constitutional violation, however, the municipality cannot be liable under § 1983. *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1317–18 (10th Cir. 2002).

The court determined above that Barber could not be held liable for unlawful execution of a search warrant. The City of Altamont, Kansas, therefore, cannot be held liable, and the court dismisses plaintiffs' claims against the City of Altamont.

## 3. The County Defendants

### a. Did the Searches Violate Plaintiffs' Constitutional Rights?

■ The ˝Fourth Amendment guarantees the right of the people to be secure against unreasonable searches and seizures. U.S. Const. Amend. IV; *Soldal v. Cook County, Ill.,* 506 U.S. 56, 62, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). To be constitutionally valid under the Fourth Amendment, a search must be reasonable. That is, it must be conducted pursuant to a valid search warrant and executed in accordance with Fourth Amendment principles. For a valid warrant to issue, it must appear from the affidavits supporting the application for the warrant that "there is probable cause to believe that an offense has been committed and that the defendant has committed it." Fed.R.Crim.P. 4; *Salmon v. Schwarz,* 948 F.2d 1131, 1136 (10th Cir.1991) (citing *Wong Sun v. United States,* 371 U.S. 471, 481 n. 9, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). "The Fourth Amendment requires only that the warrant contain probable cause supported by an oath or affirmation and a particular description of the place, persons, and things to be searched and seized." *United States v. Green,* 178 F.3d 1099, 1106 (10th Cir.1999) (citing *United States v. Wicks,* 995 F.2d 964, 972 (10th Cir.1993)). Moreover, "the general touchstone of reasonableness which governs Fourth Amendment analysis, *see Pennsylvania v. Mimms,* 434 U.S. 106, 108–09, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam), governs the method of execution of the warrant." *United States v. Ramirez,* 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998).

■ The court reviews a challenge to a search warrant by paying " 'great deference' " to the magistrate's or judicial officer's " 'determination of probable cause.' " *Ill. v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (quoting *Spi-*

*nelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)). The court employs a "totality of the circumstances" analysis to the magistrate's decision: "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238, 103 S.Ct. 2317. The Fourth Amendment is satisfied if the issuing judge "had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing." *Id.* at 236, 103 S.Ct. 2317 (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)).

**(1) Heiskell's Reliability As an Informant**

■ Plaintiffs first argue that the search warrant was not supported by probable cause because Heiskell was an unreliable informant. Again, a magistrate employs a totality-of-the-circumstances approach to evaluating the credibility of an informant who supplies information in support of a search warrant. *See Gates,* 462 U.S. at 234, 103 S.Ct. 2317. Recognizing that at times an informant's motives may be questionable, the Supreme Court stated that "his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case." *Id.* Detailed observations, rather than generalized allegations, contribute in significant measure to the magistrate's attempt to make "a balanced measure of the relative weights of all the various indicia of reliability (and unreliability)." *Id.* Moreover, when an informant's information is corroborated by independent evidence, or the informant has a track record of supplying reliable information, the information may be sufficiently reliable to establish probable cause to issue a warrant. *United States v. Williams,* 10 F.3d 590, 593 (8th Cir.1993) (citing *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959)). Once independent corroboration demonstrates the informant's reliability, "then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." *Id.* (citing *Gates,* 462 U.S. at 233–34, 103 S.Ct. 2317; *Draper,* 358 U.S. at 313, 79 S.Ct. 329).

■ Plaintiffs allege that Heiskell's unreliability was obvious to defendants[3] for several reasons: Heiskell had three prior juvenile convictions for felony theft, residential burglary, and misdemeanor criminal damage; Heiskell was "known by defendants to abuse drugs and alcohol," and that he used drugs the evening he was with the five student plaintiffs;[4] and, Heiskell was known to have "mental and emotional problems" and was known to have been off his medication at the time of making his allegations.[5]

---

3. Throughout their brief, plaintiffs generalize what "defendants" knew or "defendants" did, but without distinguishing to which specific defendant or defendants they refer. The court assumes plaintiffs employ "defendants" as a generic short-hand and do not allege that all the defendants acted in concert with regard to every allegation that plaintiffs make.

4. In this section of plaintiffs' brief, plaintiffs refer to Heiskell's "heinous plot against the

school," or in other sections to Van Buren as "the other young man who was plotting with Heiskell to attack the school." Plaintiffs, however, offer no evidence to support such theories; thus the court does not consider these allegations when evaluating the issues presented for summary judgment.

5. Plaintiffs also allege that Heiskell was "intoxicated with drugs at the time he made his allegations," and that Heiskell "was set for an

 With regard to plaintiffs' first allegation, an informant's criminal record does not automatically render him unreliable, particularly, as in this case, where the informant's identity is not confidential. *United States v. Dennis*, 625 F.2d 782 (8th Cir.1980). An informant's criminal record is but one factor for the magistrate to consider when evaluating the totality of the evidence to support probable cause to issue a warrant. In this case, the affidavit for the search warrant detailed Heiskell's criminal record, thereby allowing the magistrate to consider this factor before making his decision.

The affidavit for the search warrant also reported the substance of plaintiffs' second allegation. The affidavit stated that Heiskell was at Smith's home and that the boys "were drinking and taking drugs."

Plaintiffs' third allegation actually refers to Heiskell's diagnosis with ADD and prescribed medication to address the disorder, of which Cartwright was aware. Blundell, Higgins, and Davis were unaware of Heiskell's diagnosis and therefore did not inform the magistrate of this fact. Even had Higgins been aware of this fact, the court cannot conclude that he was required to include Heiskell's diagnosis in his affidavit. Plaintiffs offer no factual or legal support for the argument that an ADD individual is intrinsically dishonest or likely to provide unreliable information.

expulsion hearing the day he concocted his allegations against the five boys." Plaintiffs present absolutely no evidence of the first statement, making the allegation not only unsupported but irresponsible. The only support plaintiffs offer for their second allegation is the hearsay statement of plaintiff Sanders. Consequently, the court will not consider this allegation. *See Adams v. Am. Guarantee and Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir.2000) ("Hearsay testimony that would be inadmissable at trial cannot be used to defeat a motion for summary judgment.").

Plaintiffs also point to Heiskell's deposition where he appears to state that he is bipolar. However, plaintiffs offer no evidence that Cartwright, or anyone else, was aware of this purported fact. Absent such knowledge at the time the affidavit was submitted, Heiskell's later deposition testimony that he is bipolar cannot be used to challenge the determination that Heiskell was a reliable informant.

### (2) Van Buren's Corroboration

 Plaintiffs next alternate between asserting that defendants did nothing to corroborate Heiskell's information or that the interview with Van Buren "failed to corroborate Heiskell's story to any reliable degree."[6] Prior to applying for a search warrant, KBI Special Agent Beckham interviewed Van Buren in an attempt to confirm Heiskell's story. Van Buren reported that McReynolds had approached him at LCHS on Friday, December 17, and told him that McReynolds and some other boys had a plan to attack the school. According to Van Buren, McReynolds asked him if he wanted to participate by sitting on top of a building adjacent to LCHS and shooting people as they came out. If Van Buren did not wish to join the plan, McReynolds reportedly warned, then he should not come to LCHS on Monday, December 20.

Van Buren's information, then, confirmed the general outlines of Heiskell's detailed allegations. Important to the

**6.** Plaintiffs spend several pages arguing that there are inconsistencies in defendants' report of the timing of certain events at LCHS on Friday, December 17, which, plaintiffs assert, should cast doubt on the veracity of the defendants as a whole. As plaintiffs do not explain the specific relevance of these allegations to the issue of whether defendants' had probable cause to obtain a search warrant, the court will not address their theory.

court here is that Van Buren reported that he gained this information independently of Heiskell-when McReynolds approached Van Buren at LCHS. Van Buren did not have access to the same specific information as did Heiskell, but 100 percent corroboration of Heiskell's testimony was not necessary to support a probable cause determination. *See Easton v. City of Boulder, Colo.,* 776 F.2d 1441, 1450 (10th Cir. 1985) ("Even with respect to evidence admitted during a trial, we have noted that '[e]vidence is not necessarily insufficient merely because the witness' testimony has been contradictory and the explanations therefore difficult of belief.' We would indeed be amiss if we were to hold police officers and magistrates to a stricter standard when evaluating evidence for a probable cause determination." (citations omitted)).

The five student plaintiffs contend that Higgins intentionally left out information from Beckham's interview of Van Buren in order to shield material information from the district court judge. Specifically, the five student plaintiffs allege that Higgins left out the following statements:

- "He [Van Buren] planned on going to school on Monday because, in his opinion, McReynolds and Smith would not go through with the unknown plan."
- "McReynolds did not specify what the plan was nor who else was involved."

A party may challenge the content of an affidavit by making "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit."

*Franks v. Del.,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). *Franks* also allows a party to challenge a material omission when the affidavit, containing the omitted material, would not be sufficient to support a finding of probable cause. *United States v. Kennedy,* 131 F.3d 1371, 1376 (10th Cir.1997) (citing *Franks,* 438 U.S. at 155–56, 98 S.Ct. 2674). Note, however, that "not every omission of relevant information will be regarded as 'material.' The omitted information must be so probative as to negate probable cause." *Stewart v. Donges,* 915 F.2d 572, 582 n. 13 (10th Cir.1990).

Plaintiffs offer no evidence that Higgins had access to Beckham's entire report, although they do argue that the wording of the affidavit closely resembles that of Beckham's report. Absent any evidence relating to the matter, however, the court cannot conclude that Higgins viewed the entire report. Plaintiffs' claim that Higgins intentionally omitted relevant information from his affidavit must therefore fail. However, even if plaintiffs produced evidence supporting their assertion, plaintiffs' *Franks* claim is still untenable. Van Buren stated that in his opinion the boys would not carry out the plan, but his statement does nothing to call into question the *existence* of the plan or the intent with which the plan was formulated. Further, the fact that Van Buren was unaware of the details of the plan does not change his statement that the boys had a plan for attacking the school. The court concludes that no reasonable jury could find that the absence of the above two statements from Higgins's affidavit represented a material omission that negated probable cause for the search warrant.[7]

7. Plaintiffs also assert that "[d]efendants heavily rely upon information supposedly provided by Stacy Smith from Heiskell and Van Buren to demonstrate the existence of probable cause," and then challenge her use as a source of information. However, Higgins's affidavit does not make any reference to Smith, and plaintiffs offer no evidence that probable cause was based upon any information from Smith; therefore, the court will not address this argument.

**(3) Was the Search Warrant Supported by Sufficient Probable Cause?**

The primary basis for plaintiffs' contention that probable cause did not exist to obtain a search warrant is that Heiskell was an unreliable informant. Two of the three supportable allegations put forth by plaintiffs, namely that Heiskell had a criminal record and that he was using drugs and/or alcohol on the night of December 16, were made known to the district court judge in Higgins's affidavit. The third, that Heiskell has ADD, is not probative to his reliability.

The court gives great deference to the district court judge's decision to issue the search warrant. Heiskell offered specific, first-hand information, which "entitles his tip to greater weight than might otherwise be the case." *See Gates,* 462 U.S. at 234, 103 S.Ct. 2317. Moreover, Van Buren confirmed the existence of the alleged plot, independently of Heiskell, because of his encounter with McReynolds, making permissible the inference that Heiskell's information was reliable. *See Williams,* 10 F.3d at 593. Evaluating the totality of the circumstances, the district court judge was aware of the factors that might call into question Heiskell's reliability [8] but concluded that sufficient probable cause existed. Viewing the evidence in the light most favorable to plaintiffs, the court concludes that a reasonable jury could not find that the district court judge's decision that there was a "fair probability that contraband or evidence of a crime will be found in a particular place" was improper. *Gates,* 462 U.S. at 239, 103 S.Ct. 2317.

**b. Blundell, Higgins, and Davis**

**(1) Official Capacity**

■■■ Plaintiffs named Blundell, Higgins, and Davis in both their official and individual capacities. A government official sued in both their official and individual capacities are " 'treated as ... two different legal personages.' " *Johnson v. Bd. of County Comm'rs for County of Fremont,* 85 F.3d 489, 493 (10th Cir.1996) (quoting *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 543 n. 6, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986)). Individual capacity suits " 'seek to impose personal liability upon a government official for actions he takes while under color of state law,' " while an official capacity suit is " 'only another way of pleading an action against an entity of which an officer is an agent.' " *Id.* (quoting *Ky. v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). Municipalities should be named directly, rather than naming municipal officials in their official capacity. *Graham,* 473 U.S. at 167 n. 14, 105 S.Ct. 3099; *see also Sauceda v. Dailey,* No. 97–2278–JWL, 1998 WL 422811, at *11 n. 7 (D.Kan. Jun.12, 1998) ("[P]laintiff's claim against Sheriff Dailey is tantamount to a claim against the county."). Plaintiffs' official capacity suits against Blundell, Higgins, and Davis are therefore dismissed.

**(2) Individual Capacity**

■■■ The initial step in assessing a government official's personal liability is to determine whether the official's conduct violated a constitutional right. *Saucier v.*

---

8. Plaintiffs refer to Heiskell's "lies" about the five student plaintiffs, and that he was a totally unreliable witness. The evidence does not support the plaintiffs' assertion that Heiskell totally fabricated a story about the five student plaintiffs. Heiskell did retract certain details of his allegations, but not the substance of the conversation that took place the

evening of December 16. Even the five student plaintiffs admitted that the conversation took place, but later said that they were not serious about the plan. The evidence, then, is disputed as to the intent of the five student plaintiffs, but does not show Heiskell to be conclusively unreliable.

*Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). As the court has concluded that plaintiffs' Fourth Amendment rights against improper searches were not violated, Blundell, Higgins, and Davis cannot be held liable in their individual capacities.

■ Even had Blundell's, Higgins's, and Davis's action violated plaintiffs' constitutional rights, they are entitled to exert qualified immunity against a civil action. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "[G]overnment official performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.*

The Constitution clearly establishes that individuals have the right to be free from warrantless searches of their homes unless the searching officers have probable cause. "[H]owever, as the Supreme Court has explained, 'if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow,*' and would not reasonably allow officials to anticipate when their actions may give rise to liability for damages." *Lawmaster v. Ward,* 125 F.3d 1341, 1350–51 (10th Cir.1997) (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Therefore, that the law is clearly established "ordinarily means that there must be Supreme Court or Tenth Circuit opinion on point, or the clearly established

weight of authority from other courts must have found the law to be as the plaintiff maintains." *Garramone v. Romo,* 94 F.3d 1446, 1451 (10th Cir.1996).

With regard to a search of an individual's home, there is a general "evidentiary presumption that when a police officer carries out a search based on a warrant it is a good faith search." *Jenkins,* 81 F.3d at 995–96. Nevertheless, an officer may still face liability under § 1983 "for obtaining a warrant not supported by probable cause when the application for the warrant 'is so lacking in indicia of probable cause as to render official belief in its existence unreasonable,' despite a magistrate's authorization for the warrant." *Kaul v. Stephan,* 83 F.3d 1208, 1213 n. 4 (10th Cir.1996) (citing *Malley v. Briggs,* 475 U.S. 335, 344–45, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (citing *United States v. Leon,* 468 U.S. 897, 922–23 & 922 n. 23, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984))).[9] To determine whether this test is met, the court's "inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon,* 468 U.S. at 923, 104 S.Ct. 3430; *see also Thompson v. Reuting,* 968 F.2d 756, 760 (8th Cir.1992) ("[t]he issue is not whether the affidavit actually establishes probable cause, but rather whether the officer had an objectively reasonable belief that it established probable cause.").

In this case, plaintiffs argue that the search warrant was obviously lacking in probable cause due to Heiskell's unreliability. The court addressed above the bases for plaintiffs' contention that Heiskell was

---

**9.** The Supreme Court recognized in *Malley* that "the same standard of objective reasonableness that we applied in the context of a suppression hearing in *[U.S. v.] Leon, supra,* defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest. Only

where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable, *Leon, supra,* at 923, 104 S.Ct. 3405, will the shield of immunity be lost." *Malley,* 475 U.S. at 344–45, 106 S.Ct. 1092.

not a reliable informant. The relevant assertions, Heiskell's criminal record and his use of drugs and/or alcohol, were before the issuing judge. Further, Van Buren corroborated Heiskell's story, and his corroboration was contained in the affidavit for the search warrant, which gave Heiskell's allegation more credibility. *See Williams*, 10 F.3d at 593. The court therefore concludes that no reasonable trier of fact could find that Blundell, Davis, and Higgins did not act under the objectively reasonable belief that the search warrant established probable cause. Plaintiffs' claim against Blundell, Davis, and Higgins in their individual capacities is dismissed.

### c. Labette County

Labette County, as a local government entity, can be liable under § 1983 if a county official in his official capacity violates an individual's constitutional rights through execution of the county's custom, policy, or practice. *See Monell*, 436 U.S. at 694, 98 S.Ct. 2018.

The court concluded above that sufficient probable cause existed to support the search warrant executed on the Smith's, McReynolds's, Vail's, and Spencer's residences. Therefore, because there was not a violation of plaintiffs' constitutional rights, the claim against Labette County must be dismissed. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986).

### B. Arrest Without Probable Cause of the Five Student Plaintiffs

The five student plaintiffs and Gayle Vail bring a claim for arrest without probable cause against all defendants.

### 1. Barber [10]

 Defendant Barber similarly contends that summary judgment should be granted as to plaintiffs' Fourth Amendment claim against him for arrest without probable cause because he was not present during any of the plaintiffs' arrests except Spencer, and he did not participate in Aaron Spencer's arrest; rather, he was in another room of the house during the arrest. Plaintiffs have responded with a very generalized section on whether probable cause existed to arrest the affected plaintiffs. Plaintiffs address the issue of whether "defendants" acted properly, but do not respond to Barber's specific arguments for summary judgment.

To prevail under § 1983, a plaintiff must show that the defendant personally participated in the alleged constitutional violation. *Jenkins*, 81 F.3d at 994. Therefore, plaintiffs' claims, other than Aaron Spencer's, will be dismissed because Barber was not present at their homes and did not participate in their arrests. Further, because the sheriff's department arrested Aaron Spencer, without the participation of Barber, the court concludes that William H., Denise, and Aaron Spencer's claims against Barber are dismissed as well. *See id.* at 995 (upholding summary judgment in favor of law enforcement agent because plaintiffs' claim, which provided no evidence directly linking law enforcement agent to alleged constitutional violations, "amount[ed] to a claim that he should be held liable because he was in the home when the alleged deprivations occurred.").

### 2. City of Altamont, Kansas

Because the court determined that Barber could not be found liable for unlawful

---

10. The pretrial order did not list Barber or the City of Altamont as defendants to this claim. Nevertheless, both Barber and the City of Altamont remained defendants based upon the court's denial of their motion to dismiss this claim. *See* Memorandum and Order, March 22, 2002 (Doc. 48).

arrest without probable cause, the court dismisses this claim against the City of Altamont, Kansas as well. *See Monell,* 436 U.S. at 694, 98 S.Ct. 2018.

### 3. U.S.D. 506

#### a. Official Policy

The court previously dismissed the false arrest claims against Wilson and Cartwright because the court determined that they were immune from suit. *See* March 22, 2002, Memorandum and Order (Doc. 49). The five student plaintiffs' false arrest claim may proceed against U.S.D. 506, however, if Wilson or Cartwright's actions constituted a constitutional violation.

■ School districts, as quasi-municipal agencies, can be sued for monetary, declaratory, or injunctive relief for depriving a plaintiff of constitutional or civil rights. *Seamons v. Snow,* 206 F.3d 1021, 1029 (10th Cir.2000) (citing *Monell,* 436 U.S. at 690, 98 S.Ct. 2018). However, a "municipality cannot . . . be held liable for the actions of its employees under the theory of respondeat superior." *Id.* (citing *Monell,* 436 U.S. at 691, 98 S.Ct. 2018). Instead, to establish municipal liability a plaintiff must show that "the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action." *Seamons,* 206 F.3d at 1029 (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion) and *Murrell v. Sch. Dist. No. 1,* 186 F.3d 1238, 1248–49 (10th Cir.1999)). A municipal policy may be established by a single edict or act by a municipal official with final policy making authority. *Monell,* 436 U.S. at 694, 98 S.Ct. 2018. Whether an official has policy making authority depends upon state law. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 124, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

■ Wilson and Cartwright assert that neither of them had official policy-making authority because such authority was solely vested in the school board. Defendants, however, state this proposition as a fact but cite no state-law authority for support. The five student plaintiffs have simply not responded to this portion of defendants' motion to dismiss.

The court, on its own, was unable to conclusively determine whether, under Kansas law, a principal or superintendent acts as a policy-making official of a school district. A principal certainly carries some degree of authority to make decisions for a school. Likewise, a superintendent sits in authority above the principal. Therefore, for purposes of this decision, the court will assume, without deciding, that Wilson and Cartwright are officials with policy-making authority whose acts could render U.S.D. 506 liable.

#### b. Personal Participation

Aside from showing that Wilson and Cartwright's actions amounted to an official policy or custom of the school district, plaintiffs must demonstrate that Wilson and Cartwright personally participated in the alleged false arrest. *See Jenkins,* 81 F.3d at 994.

The court previously found that it was appropriate to examine plaintiffs' unreasonable seizure claims within the context of common law false arrest and false imprisonment claims. *See* March 22, 2002 Memorandum and Order (Doc. 49). The court then held that plaintiffs had sufficiently pled that defendants' actions met the elements of these claims under Kansas law. As the five student plaintiffs have not responded to defendants' argument on this issue, the court will rely on defen-

dants' previous allegations and the facts asserted in their response.

 Under Kansas law, a plaintiff seeking to recover under a claim for false arrest must prove that the defendant "either instigated it, assisted in it, or by some means directed or encouraged it." *Thurman v. Cundiff*, 2 Kan.App.2d 406, 408, 580 P.2d 893 (1978). The *Thurman* court went on to state that: " 'It is not necessary, to impose liability, that the defendant expressly direct the arrest. Nor need he be present when the arrest is actually made. However, he must take some active part in bringing the arrest about that is, there must be some affirmative act on his part which induces the officer to make the arrest....' " *Id.* (quoting 32 Am.Jur.2d, False Imprisonment, s 35, pp. 98–99). The defendant, therefore, must take an active, affirmative step to have the plaintiff arrested, as in *Thurman* where one of the defendants informed the arresting deputies that plaintiff had cut the defendants' fence, veered at him, and driven on the defendants' private driveway, without telling the deputies that the plaintiff was a lessee of the land.

In this case, the five student plaintiffs have not presented any facts of Cartwright and Wilson's involvement in their arrest other than that they received information from Heiskell, passed it along to law enforcement personnel, and organized and participated in a meeting on school premises where the informing student provided further information to law enforcement personnel. Moreover, plaintiffs' last allegation is not supported by the record, as after law enforcement officials arrived, they directed the interview of Heiskell, and Wilson sat in on the interview only as a passive observer. Plaintiffs have not alleged any facts to support their claim that Wilson or Cartwright personally participated in their eventual arrests. Neither Wilson nor Cartwright took any ac-

tive part in bringing about their arrest or took any action to induce their arrest. Rather, Cartwright merely informed law enforcement officials of Heiskell's initial report, while Wilson sat in the same room where the officers interviewed Heiskell.

The court concludes that neither Cartwright nor Wilson personally participated in the alleged violation of the five student plaintiffs' Fourth Amendment right against unreasonable arrest. Therefore, neither can U.S.D. 506 be held liable. The court grants U.S.D. 506's motion for summary judgment and dismisses plaintiffs' unreasonable arrest claim against it.

### 4. Labette County

Labette County, as a local government entity, can be liable under § 1983 if a county official in his official capacity violates an individual's constitutional rights through execution of the county's custom, policy, or practice. *See Monell*, 436 U.S. at 694, 98 S.Ct. 2018. The court will first examine whether each plaintiff has set forth specific facts supporting his or her claim for arrest without probable cause. If a violation occurred, the court will next determine whether the deprivation was the result of a county custom or of an act by an official with final policy-making authority.

### a. Constitutional Violation

 The Fourth Amendment requires that a warrantless arrest be supported by sufficient probable cause to believe that the arrestee committed a crime. *Tenn. v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). " 'Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.' "

*Olsen,* 312 F.3d at 1312 (quoting *Romero v. Fay,* 45 F.3d 1472, 1476 (10th Cir.1995)). Probable cause does not demand that there be sufficient knowledge of facts sufficient for a finding of guilt, but it requires "more than mere suspicion." *United States v. Vazquez–Pulido,* 155 F.3d 1213, 1216 (10th Cir.1998) (citing *United States v. Hansen,* 652 F.2d 1374, 1388 (10th Cir. 1981)).

### (1) Daniel Smith and Gayle Vail

 When law enforcement officers entered the Smith's residence to execute the search warrant, Daniel Smith fled onto the roof of the residence carrying marijuana and cash. Officers outside the residence apprehended Daniel Smith before he fled any further. A search of his room turned up additional drug paraphernalia. Defendants Labette County, Blundell, Higgins, and Davis contend there was sufficient probable cause to arrest Smith.

Smith was ultimately charged with several drug offenses and several counts of conspiracy to commit murder, but police officers did not need probable cause as to both categories of offenses. Regardless of whether probable cause existed to arrest Daniel Smith on the conspiracy charges, the fact that officers had probable cause to arrest him on the drug charges precludes his § 1983 claim. *See Fillmore v. Ordonez,* 829 F.Supp. 1544, 1557 (D.Kan.1993) (citing *Elbrader v. Blevins,* 757 F.Supp. 1174, 1178 (D.Kan.1991)).

 When law enforcement officers entered the Vail's residence, they observed Gayle Vail smoking marijuana and arrested her for possession of marijuana. The court, therefore, dismisses Gayle Vail's claim for arrest without probable cause because the officers' observation gave them probable cause to arrest her on that charge.

### (2) Traxson, Vail, McReynolds, and Spencer

 Labette County asserts that probable cause existed to arrest Traxson and Vail because drugs and/or drug paraphernalia were found in the rooms in which they slept. Traxson was asleep in Smith's room, which contained the items detailed above, and Vail was asleep on the couch in the front room of the Vail's residence where officers found marijuana and drug paraphernalia. At issue, though, is whether the drugs and paraphernalia can be attributed to Traxson and Vail. Neither Traxson nor Vail were charged with a drug-related crime, instead the evidence was used to charge Smith and Gayle Vail. A false arrest claim will fail where probable cause exists for at least one of the charges against a plaintiff in a § 1983 case. *See Elbrader,* 757 F.Supp. at 1178. It is not appropriate, however, for the court to allow defendant Labette County to now base their probable cause argument on a charge that was never brought against Traxson or Vail.

 Labette County could potentially be liable for the false arrests of Traxson, Vail, McReynolds, and Spencer if probable cause did not exist to support the charges of conspiracy to commit murder. Labette County contends that the searches of the five student plaintiffs' residences uncovered numerous firearms, including some as described by Heiskell; sheriff uniforms and black gloves and shirt at the McReynolds's residence; and drugs and drug paraphernalia at the Smith's and the Vail's residences. Plaintiffs contend that the firearms were "hunting-type guns ... securely in the possession of the boys' parents"; that the sheriff uniforms belonged to Billy McReynolds who was a reserve deputy; and that the black clothing was sports attire.

Probable cause to arrest Traxson, Vail, McReynolds, and Spencer rested on Heis-

kell's and Van Buren's information and the evidence found during the search. Plaintiffs do not controvert the substance of the information itself; rather, they contend that Heiskell was not a reliable informant. In relation to probable cause to issue a search warrant, the court examined plaintiffs' allegation that Heiskell was an unreliable informant because of his two previous juvenile convictions and his history of drug and alcohol use.[11]

Even if the court assumes that these two factors cast doubt on Heiskell's reliability, the court concludes that no reasonable jury could find that the officers lacked probable cause to arrest Traxson, Vail, McReynolds, and Spencer. Heiskell provided extensive, first-hand information about the alleged plot to attack LCHS. Van Buren provided independent corroboration of the existence of a plan to attack LCHS. Then, when law enforcement officials searched the Smith's, McReynolds's, Spencer's, and Vail's residences, they found several weapons, including three of the weapons Heiskell specifically described, and the sheriff's uniforms Heiskell described. Law enforcement officials had information that the boys had access to the weapons in the homes because they reportedly had fired those weapons on other occasions. Plaintiffs contend that the weapons and sheriff's uniforms belonged to the boys' parents. "The standard of probable cause does not require indubitable or necessarily convincing evidence, but only so much 'reasonably trustworthy information' as 'to warrant [a] prudent man in

believing that [the] arrestee has committed or is committing [an] offense." *Easton,* 776 F.2d at 1450 (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). Based upon the first-hand, detailed information Heiskell provided, which Van Buren independently corroborated, which was further supported by the evidence found during the searches of the boys' residences, the court concludes that as a matter of law probable cause existed to arrest Traxson, Vail, McReynolds, and Spencer.

**b. Official Policy or Custom**

██ Even if probable cause did not exist to support the arrests of the five student plaintiffs, they have not alleged that their arrests were the result of an official policy or custom of Labette County. The court must assume therefore that plaintiffs assert that Labette County should be liable for the alleged unconstitutional arrests based on the acts of Blundell as the county official with policy-making authority.

The county may be held liable under § 1983 for single acts or decisions made by county officials with policy-making authority and whose decisions constitute county policy. *Pembaur,* 475 U.S. at 483, 106 S.Ct. 1292. The only assertion that plaintiffs' make of Blundell's involvement in their arrest is that: "The determination to make these arrests was done on the authority of defendants Blundell and Higgins." However, plaintiffs do not offer *any* evidence that Blundell made the decision to arrest the five student plaintiffs.[12]

---

11. Plaintiffs contend that Heiskell's unreliability was further demonstrated when he later recanted certain details of the information he provided to police is not relevant here. The court must examine what the officers knew at the time they arrested the five student plaintiffs. *Valdez v. McPheters,* 172 F.3d 1220, 1227 n. 4 (10th Cir.1999).

12. Further, Justice White's concurring opinion in *Pembaur* casts doubt on whether Labette County could be held liable *even if* evidence demonstrated that Blundell had made the decision to arrest the five student plaintiffs: "A sheriff, for example, is not the final policymaker with respect to the probable-cause requirement for a valid arrest. He has no alternative but to act in accordance with

Indeed, citing Higgins's deposition, plaintiffs state that: "Scott Higgins was the officer in charge of the search at the Smith residence," and do not proffer any evidence of who directed the other searches or who directed the arrests of the five student plaintiffs.

Labette County could still be liable if Higgins made the decision to arrest the five student plaintiffs, and plaintiffs alleged that Blundell delegated or ratified the decision. Again, however, plaintiffs have not advanced that theory nor offered any evidence supporting it. *See Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915 ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."); *Id.* at 130, 108 S.Ct. 915 ("Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy.").

Therefore, because plaintiffs have presented no evidence that their alleged arrest was the result of an official policy or custom of Labette County, the court grants Labette County's motion for summary judgment on this claim.

### 5. Blundell, Higgins, and Davis

#### a. Official Capacity

Following the court's reasoning above, the official capacity claims against Blundell, Higgins, and Davis are actually claims against Labette County and as such are dismissed.

#### b. Individual Capacity

 Even if Blundell, Higgins, and Davis did not have probable cause to arrest the five student plaintiffs, they may

the established standard; and his deliberate or mistaken departure from the controlling law of arrest would not represent municipal

assert the defense of qualified immunity. Qualified immunity shields these defendants from civil liability if their actions did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727. Qualified immunity questions most often present legal questions that the court should resolve on summary judgment. *Maestas v. Lujan*, 351 F.3d 1001, 1010 (10th Cir.2003). The court must first determine whether plaintiffs have alleged a violation of a constitutional or federal statutory right. *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 516 (10th Cir.1998) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 842 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). Only where the complaint alleges a valid claim does the court examine whether the right is clearly established such that a reasonable official would understand that his actions violate that right. *Id.* The law is clearly established if there is "Supreme Court or Tenth Circuit opinion on point" that has found "the law to be as the plaintiff maintains." *Garramone*, 94 F.3d at 1451.

" 'Under a § 1983 claim of unlawful arrest, [d]efendant police officers lose their shield of qualified immunity only if they could not have believed that [the plaintiff's] arrest was based on probable cause.' " *McCormick v. City of Lawrence*, 271 F.Supp.2d 1292, 1304 (D.Kan.2003) (quoting *Thompson v. City of Lawrence*, 58 F.3d 1511, 1515 (10th Cir.1995) (citation omitted)). Therefore, the critical question is not whether probable cause actually existed, but whether "a reasonable officer could have believed that probable cause existed to arrest the plaintiff." *Romero*, 45 F.3d at 1476.

policy." *Pembaur*, 475 U.S. at 486, 106 S.Ct. 1292 (White, J., concurring).

The court concludes that Blundell, Higgins, and Davis are immune from suit. Based upon the detailed information Heiskell provided, along with Van Buren's corroboration, which was further supported by the evidence found during the searches, a reasonable officer would have concluded that probable cause existed to arrest the five student plaintiffs. *See Olsen,* 312 F.3d at 1312 ("The primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the 'information possessed by the [arresting] offic[er].'" (citing *Romero,* 45 F.3d at 1476 (quoting *Anderson v. Creighton,* 483 U.S. 635, 643, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)))).

### C. Detention of the Remaining Plaintiffs During Searches

The remaining plaintiffs also claim they were unlawfully arrested. The remaining plaintiffs bring their claim based on their detention while law enforcement officials executed the search warrants at the five student plaintiffs' residences.

■■■ The Supreme Court has made clear that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Mich. v. Summers,* 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (citations omitted); *see also United States v. Edwards,* 103 F.3d 90, 93 (10th Cir.1996). As this court has previously held, even detentions of 2½ hours while executing a proper search warrant are constitutional. *Mitchell v. Unified Gov't,* No. Civ.A. 00–2116–CM, 2000 WL 1920036, at *8 (D.Kan. Dec.21, 2000).

In this case, law enforcement officials detained the remaining plaintiffs for a limited time period while executing a valid warrant. Consequently, the remaining plaintiffs' false arrest claims must be dismissed.

### D. Continued False Arrest/False Imprisonment

The five student plaintiffs bring a claim for continued false arrest against the county defendants. The five student plaintiffs claim that, after being arrested, they were falsely imprisoned and prosecuted without probable cause. The five student plaintiffs do not specify the legal theory on which they rest their claim, but the court will assume they intend to advance a false imprisonment claim under § 1983.

■■■ The fundamental issue in a claim for false imprisonment is whether probable cause existed to support the arrest. *Arceo v. City of Junction City, Kan.,* 182 F.Supp.2d 1062, 1091 (D.Kan.2002). Further, a plaintiff asserting a false imprisonment claim must demonstrate that a law enforcement official "acted with deliberate or reckless intent to falsely imprison the plaintiff." *Romero,* 45 F.3d at 1480.

The five student plaintiffs argue that "[n]othing garnered from the interviews or interrogations [of them] supported probable cause to believe that the boys had planned such a heinous plot." Plaintiffs' Response at 263.

■■■ However, the uncontroverted record shows that the five student plaintiffs substantially confirmed the details of the conversation that Heiskell reported. Where the five student plaintiffs' versions of events differ is that they reported that the conversation was intended as a joke and that they had not intended to follow through on the plans. As the court already has concluded, probable cause existed to arrest the five student plaintiffs. Once probable cause is established, law enforcement officials do not face liability merely for refusing to release an individual

who claims that they are innocent. *Romero*, 45 F.3d at 1480. Moreover, even if the arrests were not supported by probable cause, the five student plaintiffs have offered no evidence that law enforcement officials acted with deliberate or reckless intent to falsely imprison them. The court dismisses the five student plaintiffs' false imprisonment claim against defendant Labette County, Forer, Blundell, Higgins, and Davis.

## E. Malicious Prosecution

The five student plaintiffs bring their claim for malicious prosecution under § 1983 against the county defendants.

### 1. Constitutional Violation

 The common law tort of malicious prosecution is the starting point for the same claim under § 1983. *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir.1996). In Kansas, a plaintiff must prove the following elements to support an action for malicious prosecution: (1) that the defendant initiated, continued, or procured criminal proceedings against the plaintiff; (2) that the defendant acted without probable cause; (3) that the defendant acted with malice-that the defendant acted for a purpose other than securing the proper adjudication of the proceedings; (4) that the proceedings terminated in favor of the plaintiff; and (5) that the plaintiff sustained damages. *Nelson v. Miller*, 227 Kan. 271, 275–76, 607 P.2d 438 (1980). The "ultimate question," however, for a claim brought under § 1983, is "whether the plaintiff has proven a *constitutional* violation." *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir.1996). Plaintiff must therefore show that the defendant's actions violated the plaintiff's Fourth Amendment right to be free from unreasonable seizures. *Id.* Thus, the crucial inquiry is whether defendant acted without probable cause. *Elbrader*, 757 F.Supp. at 1178. The inquiry into the existence of probable cause "is limited to the facts and circumstances as they appeared to defendant at the time the prosecution was commenced." *Glassey v. Ramada Inn*, 5 Kan. App.2d 121, 123, 612 P.2d 1261 (1980).

The five student plaintiffs assert that the county defendants initiated the prosecution against them without probable cause that they planned an attack on the school. Again, the five student plaintiffs' argument rests on the assertion that Heiskell was an unreliable informant whose statements did not provide probable cause.

The court already has discussed the fact that defendants acted on more than Heiskell's information, and that probable cause existed for defendants to obtain search warrants and to arrest the five student plaintiffs. Further, Forer's decision to initiate proceedings was further bolstered by the five student plaintiffs' statements during their respective interrogations, which confirmed much of what Heiskell had told officials. McReynolds and Traxson stated that the five student plaintiffs and Heiskell had all talked about shooting people at the school, and that the attack would take place on Monday. Spencer stated that McReynolds made a map of LCHS. Vail also admitted being present, and that he spoke of shooting someone; and that McReynolds had suggested that Van Buren could sit on top of a building and shoot people as they came out. Again, the crucial difference is that the five student plaintiffs all claimed that the conversation was intended as a joke, and that they never intended to attack the school. However, once probable cause has been established, defendants' initiation of criminal proceedings, notwithstanding the five student plaintiffs' claims of innocence, does not violate the Constitution. *Romero*, 45 F.3d at 1477–78.

### 2. Blundell, Higgins, and Davis

As the court has already held, the five student plaintiffs' claims against Blundell, Higgins, and Davis are actually claims against Labette County. Blundell, Higgins, and Davis also cannot be held liable in their individual capacities. They participated in some capacity in the initial criminal investigation and eventual arrests and interrogations, but their participation stopped there.

A law enforcement officer cannot be held liable for malicious prosecution based upon an alleged wrongful arrest if there has been an independent hearing before a judge who determined that the evidence was sufficient to detain a suspect. *Taylor,* 82 F.3d at 1564. The hearing before a judicial officer breaks "the chain of causation" between an alleged wrongful arrest and eventual prosecution. *Id.* In this case, there is no evidence that Blundell, Higgins, and Davis participated in advancing criminal proceedings against the five student plaintiffs beyond the date of their detention hearing. The five student plaintiffs' claims for malicious prosecution against these defendants in their individual capacities must therefore be dismissed.

Additionally, even if Blundell, Higgins, and Davis had violated the five student plaintiffs' constitutional protections against malicious prosecution, these defendants' qualified immunity protects them from individual liability. According to the Tenth Circuit case of *Taylor,* a reasonable law enforcement official would conclude that his or her liability does not extend past a judicial hearing.

### 3. Forer

The five student plaintiffs' claim against Forer in his official capacity is actually a claim against Labette County. The five student plaintiffs' claim against Forer in his individual capacity must also be dismissed. The court has already determined that probable cause existed for Forer to initiate criminal proceedings against the five student plaintiffs. Even were that not the case, Forer's prosecutorial immunity bars the five student plaintiffs' claim.

A prosecutor is absolutely immune from civil liability for actions taken during the judicial process of "initiating a prosecution and presenting the State's case." *Imbler v. Pachtman,* 424 U.S. 409, 431, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). For example, a prosecutor is absolutely immune for actions taken during probable cause hearings, *Burns v. Reed,* 500 U.S. 478, 492, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), or preparing for and seeking an indictment, *Kalina v. Fletcher,* 522 U.S. 118, 128–29, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). Absolute immunity, however, does not extend to a prosecutor's administrative duties or actions that are more akin to investigatory functions. *Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Consequently, a prosecutor is not afforded absolute immunity for providing legal advice to the police, *Burns,* 500 U.S. at 496, 111 S.Ct. 1934, or serving as the complaining witness on a search warrant, *Kalina,* 522 U.S. at 130–31, 118 S.Ct. 502.

The five student plaintiffs contend that several of Forer's actions fell outside of his role as advocate for Labette County. Specifically, the five student plaintiffs assert that Forer helped gather evidence to support the search warrant; provided legal advice to other defendants regarding the search warrant; participated in two of the searches; and sat in on all of the five student plaintiffs' interrogations. However, the five student plaintiffs offer no evidence to support these allegations, and the court will therefore not consider them.

The five student plaintiffs do offer evidence to support their allegation that For-

er assisted in the preparation of the affidavit for the search warrant, although he did not sign the affidavit. Forer's participation in the preparation of the affidavit may threaten his absolute immunity if his action crossed the line between advocate and investigator. In some cases, the line between the two roles is not obvious, and the underlying purpose of the prosecutor's action must be discerned. That is, "absolute immunity may attach even to such administrative and investigative activities 'when these functions are necessary so that a prosecutor may fulfill his function as an officer of the court.'" *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1490 (10th Cir.1991) (quoting *Snell v. Tunnell*, 920 F.2d 673, 693 (10th Cir.1990)). A prosecutor who assists in the preparation of an affidavit in support of a search warrant does not necessarily act as an investigatory officer. *Lomaz v. Hennosy*, 151 F.3d 493, 498–99 (6th Cir.1998). Forer did not gather or assist in the gathering of evidence, which is a investigatory function. Instead, Forer reviewed and evaluated evidence and then helped prepare paperwork to seek a search warrant, actions which are well within a prosecutorial role. *See Snell v. Tunnell*, 920 F.2d 673, 693 (10th Cir. 1990) (characterizing a prosecutor's "conduct in preparing and presenting the application [for an arrest warrant] before the judge as advocacy by an officer of the court, not police investigation."). The court therefore concludes that Forer enjoys absolute immunity from the five student plaintiffs' claim of malicious prosecution.

#### 4. Labette County

Labette County can only be held liable under § 1983 for malicious prosecution if the five student plaintiffs in fact suffered a deprivation of their constitutional rights, and the violation was the result of a policy of the county or the result of the action of a final decision maker. *See Monell*, 436

U.S. at 694, 98 S.Ct. 2018. The court already concluded that there was no constitutional violation of the five student plaintiffs' Fourth Amendment rights for malicious prosecution. Additionally, Labette County could not be held liable for the actions of Blundell, because as the court concluded above, the five student plaintiffs' detention hearing broke the chain of causation between Blundell's actions and the criminal proceedings brought against them.

### F. Pre-conviction Unconstitutional Jail Conditions

The five student plaintiffs bring a claim for pre-conviction unconstitutional jail conditions against Labette County, Forer, and Blundell.

#### 1. Constitutional Violation

The Due Process Clause of the Fourteenth Amendment applies to the conditions of confinement for pretrial detainees. *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Nevertheless, the Tenth Circuit has concluded that the standards of the Eighth Amendment govern such claims. *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir.1998) (citing *McClendon v. City of Albuquerque*, 79 F.3d 1014, 1022 (10th Cir.1996)). The Eighth Amendment requires that prison officials provide humane conditions of confinement, including ensuring that inmates receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A plaintiff making a claim for unconstitutional conditions of confinement "must *allege and prove* an objective component and subjective component associated with the deficiency." *Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir.2001) (emphasis added).

██ The Eighth Amendment does not mandate that prison officials make prisons comfortable. *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Indeed, jail conditions may even be restrictive or harsh and not violate an inmate's constitutional rights. *Id.* at 347, 101 S.Ct. 2392. To demonstrate the objective component, therefore, a plaintiff must show that prison officials deprived him of the "'minimal civilized measure of life's necessities.'" *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (quoting *Rhodes,* 452 U.S. at 347, 101 S.Ct. 2392). Conditions that meet this standard can rise to the level of a constitutional violation if an inmate is subjected to them for an extended period of time. *Barney v. Pulsipher,* 143 F.3d 1299, 1311 (10th Cir.1998) ("An important factor in determining whether the conditions of confinement meet constitutional standards is the length of the incarceration.").

██ The subjective component of claims for unconstitutional conditions of confinement requires the court to look to the mental state of prison officials, who must have acted with "'deliberate indifference' to inmate health or safety." *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970 (quoting *Wilson,* 501 U.S. at 300–02, 111 S.Ct. 2321). In other words, "[i]t is not enough to establish that the official should have known of the risk of harm." *Barney,* 143 F.3d at 1310. Rather, the official must know of and disregard an excessive risk to inmate health and safety. This standard is met by demonstrating that the official was "aware of facts from which the inference could be drawn that substantial risk of serious harm exists, and [that ] he ... [drew] the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970.

The five student plaintiffs assert that the constitutional protections with respect to jail conditions are higher for juveniles than adults. In support of their argument, the five student plaintiffs cite the Eighth Circuit case of *A.J. by L.B. v. Kierst,* 56 F.3d 849 (8th Cir.1995). The *Kierst* court stated that juvenile detainees should enjoy more protection than adults, but the court did not establish a different test by which to evaluate such cases. Moreover, as the *Kierst* court noted, the Supreme Court has not articulated an appropriate standard, and the five student plaintiffs have not identified any Tenth Circuit case law that supports their position. The court, therefore, will apply the legal standards set out above.

██ The five student plaintiffs argue that their conditions of confinement at the Labette County Jail in Oswego (the "Jail") violated their constitutional rights. The five student plaintiffs were held in the same cell during the time that each boy was incarcerated. Traxson was held at the Jail for 11 days; Smith, Spencer, and McReynolds for 17 days; and Vail for 21 days. The five student plaintiffs complain that during their confinement they were isolated from most human contact; their families were only allowed to visit once a week; jail officers pushed their food through a small opening at the bottom of the cell door; they had to shout upstairs to have the lights turned out at night; no sunlight entered their cell; they were only allowed outside a total of 1½ hours; water leaked into the cell and its walls were moldy; the cell was "infested" with gnats or gnat-like insects; they were provided with a mop and bucket and told to clean their cell; the toilet was not walled off from the rest of the cell; and jail officers provided them with only one towel a week.

The court concludes that the five student plaintiffs have not presented sufficient evidence such that a reasonable jury could find in their favor. By court order, the five student plaintiffs were confined in a separate area from the adult inmates,

and, as the five student plaintiffs themselves point out, Kan. Stat. Ann. § 19-1919 requires that juveniles be housed away from adults. The presence of tiny insects or being required to clean their own cell also has been found to not violate inmates' constitutional rights. *Rivera v. Leaming,* No. 99–3067–JWL, 2000 WL 382035, at *4 (D.Kan. Apr.5, 2000). Jail officers allowed the five student plaintiffs to go outside two or three times, depending on their length of incarceration, although the five student plaintiffs are quick to complain that even when they were allowed outside, "the weather was so cold as to make the experience less than enjoyable." Of the remaining complaints, the court does not find any of the conditions to be particularly shocking, and especially since the five student plaintiffs' incarceration lasted from between 11 to 21 days, the court must certainly conclude that none of their complaints rise to level of constitutional violation. The court does not doubt that conditions in the Jail were unpleasant. However, no reasonable jury could conclude that jail official deprived the five student plaintiffs of their constitutional rights as set forth by the Supreme Court.

### 2. Forer and Blundell

### a. Personal Involvement

The five student plaintiffs name Forer, Blundell, and Labette County as defendants in their conditions of confinement claim. In order for Forer and Blundell to be liable under § 1983, they must have been personally involved in the alleged violation. *Foote v. Spiegel,* 118 F.3d 1416, 1426 (10th Cir.1997).

The five student plaintiffs assert that Blundell should be held individually liable because, as sheriff of Labette County, he is responsible under Kansas law for the prisoners in the Jail. The court agrees with the five student plaintiffs' contention because Kan. Stat. Ann. § 19–811 makes Blundell the official responsible for the conditions in the Jail. Nevertheless, the court already has concluded above that there was no constitutional violation.

The five student plaintiffs have not presented any evidence that Forer was personally involved in their confinement. Reinforcing the court's holding above, the court dismisses this claim against Forer.

### b. Qualified Immunity

Forer and Blundell are immune from suit in their individual capacities unless their actions "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727.

As the court explained above, there is no case law holding that any of the conditions present in the Jail constitute a violation of an inmate's constitutional rights. As such, Forer and Blundell are entitled to qualified immunity.

### 3. Labette County

The five student plaintiffs' claim against Labette County and Forer and Blundell in their official capacities are one in the same. *See Graham,* 473 U.S. at 165, 105 S.Ct. 3099 (holding that a suit against a government official in his or her official capacity is actually a suit against the government entity). A government entity can be held liable under § 1983 only if the constitutional deprivation resulted from a policy or custom of the entity. *Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018.

As the court concluded above, there was no constitutional violation; therefore, the five student plaintiffs' claim against Labette County for unconstitutional jail conditions is dismissed.

## G. Unlawful Arrest and Prosecution of Mallory Sanders

 Sanders brings a claim for unlawful arrest and prosecution against Labette County and Forer. Sanders asserts that her only claim under § 1983 is for being charged with intimidation of a witness as a result of her altercation with Heiskell, even though the Pretrial Order states her claim as one for unlawful arrest and prosecution. Therefore, insofar as Sanders may have previously asserted other claims of unlawful arrest or prosecution, those claims are now dismissed.

Indeed, Sanders does little to support her remaining claim, citing no law and offering little in the way of argument. Sanders states that "the only facts the defendants had for charging Mallory [Sanders] came from Heiskell," and that "[s]he simply told Heiskell to tell the truth, at which he became loud, aggressive, and confrontational."

Without taking the time to pursue this issue in every relevant context, this example of plaintiffs' interpretation of the factual record provides the clearest example of their questionable interpretation, if not misinterpretation, of the factual record. First, Heiskell, Van Buren, and Gann each provided a statement of the incident between Sanders and Heiskell to law enforcement officials. Further, Sanders initiated the confrontation with Heiskell by walking over to him and called Heiskell "a fucking narc," a "fucking liar," and accused him of "ratting out his friends." At some point during the argument, Sanders pushed Heiskell, although she testified that it was in response to Heiskell's threatening gesture. Also, although not necessarily probative to the issue, the court finds relevant that LCHS teacher Milks had Sanders removed from the building, not Heiskell.

Forer charged Sanders with aggravated intimidation of a witness. To support a claim of malicious prosecution, Sanders must demonstrate that there was no probable cause to support Forer's decision. *See Vanover v. Cook,* 260 F.3d 1182, 1190 (10th Cir.2001). In this case, no reasonable jury could find that Forer lacked probable cause to charge Sanders, and, therefore, the court dismisses her claim.

## H. Unreasonable Use of Force Against Kendra Smith

### 1. Service of Process on Defendant John Reed

 Plaintiff Kendra Smith named John Doe as the defendant in her claim because she was initially unable to identify the officer who allegedly injured her during the search of the Smith's residence. As Kendra Smith admits, however, "[s]ometime after the raid, she was able to identify the officer. However, counsel was never informed of this discovery," until Smith's deposition.

As best as the court can tell, Kendra Smith was aware of Reed's identity, but did not inform her attorney until after the deadline to amend the pleadings to add parties. This excuse does not constitute good cause. Moreover, there is no evidence that Kendra Smith's attorney took any steps to ascertain Reed's identity. The court, therefore dismisses her claim against Reed. *See Scott v. Hern,* 216 F.3d 897, 912 (10th Cir.2000).

### 2. Constitutional Violation

Even if Kendra Smith had properly served Reed, she has not stated a legally sufficient claim for unreasonable use of force.

 The Fourth Amendment mandates that arrests be made without the use of excessive force. An officer's actions, therefore, must be " 'objectively reasonable' in light of the facts and circumstances

confronting" him. *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The court's inquiry into the officer's action must be made "from the perspective of a reasonable officer on the scene," recognizing that an officer is "often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865. The reasonableness of the officer's actions must be assessed in light of "the crime's severity, the potential threat posed by the suspect to the officer's and others' safety, and the suspect's attempts to resist or evade arrest." *Medina v. Cram,* 252 F.3d 1124, 1131 (10th Cir.2001) (citing *Graham,* 490 U.S. at 396, 109 S.Ct. 1865).

██ Kendra Smith presents two, contradictory versions of what happened to her during the search of the Smith's residence. In one version, she claims that noise from the officers' entry into the residence awoke her and she had gotten out of bed and was searching for a light switch when Reed encountered her. In the other, Kendra Smith asserts that when Reed found her, "she was asleep. He rousted her from sleep with a gun pointed at her and forced her into the hallway." The first version is set forth in plaintiffs' statement of facts; thus, the court assumes it provides the plaintiffs' correct recounting of events.

When Reed encountered Kendra Smith, he allegedly grabbed her by the .neck, pushed her head down, spun her 180 degrees, and pushed her to the floor. At some point during this maneuver, Kendra Smith's face struck the stair rail, resulting in a cut. The cut allegedly bled, and it was cleaned at the residence. Kendra Smith was taken to the hospital the next morning, but the cut did not require stitches or further medical care.

In this case, officers entered the Smith's residence to investigate an alleged murder plot. The search warrant stated that the occupants would potentially have access to numerous firearms. These are factors relevant to the officers' need to quickly subdue all the occupants of the home.

Reed encountered Kendra Smith in the dark and, likely not knowing her identity, reacted by spinning her around and pushing her to the floor. Certainly that action in itself cannot be considered excessive force in violation of the Fourth Amendment. Reed's actions to restrain an unidentifiable individual in the dark of a home that potentially contained armed suspects did not constitute excessive force. However, Kendra Smith also inadvertently suffered a minor cut to her face. She need not have sustained a significant injury to maintain an excessive force claim, but "the extent of injury is [a] relevant factor in assessing reasonableness of force." *Britschge v. Harmison,* 947 F.Supp. 435, 440 (D.Kan.1996). In this case, the injury was cleaned and required no further medical attention. Given that Reed's actions were appropriate in the circumstances, and that Kendra Smith suffered only a minor cut, she has not presented a cognizable claim, as a matter of law, for excessive force in violation of the Fourth Amendment.

### 3. Official Capacity

Kendra Smith's claim against Reed in his official capacity is in fact a claim against Labette County. Kendra Smith, however, did not name Labette County as a defendant to her claim. This failure could be excused initially because Kendra Smith did not know the identity of the law enforcement officer, and therefore his affiliation. However, as the record indicates, she did become aware of his identity long before her response to summary judgment

but did not attempt to add Labette County as a defendant. Nevertheless, even if Kendra Smith had added Labette County, she has failed as a matter of law to show that her constitutional rights were violated. Moreover, she has not alleged that Reed was executing official county policy or that he was an official with final policy-making authority.

### 4. Individual Capacity

Even assuming that Kendra Smith had properly served Reed, because the court has determined that no constitutional violation occurred, Reed cannot be held liable in his individual capacity.

### I. Deprivation of Procedural Due Process

The five student plaintiffs bring a claim for deprivation of procedural due process against the school district defendants.

### 1. Cartwright and Wilson

■ A student "faced with the possibility of suspension from public school is entitled to due process." *West v. Derby Unified Sch. Dist. No. 260,* 206 F.3d 1358, 1364 (10th Cir.2000). The federal courts, the Supreme Court has cautioned, should play a limited role in reviewing administrators' decisions because "public education ... is committed to the control of state and local authorities." *Epperson v. Ark.,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). "It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." *Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Nevertheless, public school students retain substantive and procedural due process rights while at school. *Id.* Students do not "shed their constitutional rights ... at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d

731 (1969). The federal courts stand to protect a student's constitutional interests, including the student's due process rights, just like any other citizen's. *See Miles v. Denver Pub. Schs.,* 944 F.2d 773, 779 (10th Cir.1991).

The Supreme Court established the baseline of a student's basic procedural due process rights in *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975): "At the very minimum, therefore, students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing." More specifically, a student facing a temporary suspension of 10 days or less must "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581–82, 95 S.Ct. 729. Longer suspensions or permanent expulsions "may require more formal procedures." *Id.* at 584, 95 S.Ct. 729.

The Tenth Circuit has examined whether a student's due process rights mandate additional procedural safeguards than those provided in *Goss.* In *Watson ex rel. Watson v. Beckel,* 242 F.3d 1237, 1242–43 (10th Cir.2001), the plaintiff argued that due process required that he "be afforded written notice specifying the charges, legal counsel, the presentation of evidence, the right to cross-examine witnesses, an impartial board, a transcript of the hearing, and independent review of the decision." The Tenth Circuit rejected plaintiff's argument, however, and held that federal court "precedent indicate[s] that due process does not require all of these rights." *Id.* at 1243 (citing *Gorman v. Univ. of R.I.,* 837 F.2d 7, 16 (1st Cir.1988) (rejecting the argument that due process requires the right to counsel, to cross-examine wit-

nesses, or to have a transcript of the hearing) and *Newsome v. Batavia Local Sch. Dist.,* 842 F.2d 920, 924 (6th Cir.1988) (holding that due process does not require the right to cross-examine witnesses or that investigating officials be excluded from the deliberation process)).

The five student plaintiffs first assert that they were deprived of their procedural due process rights when the school district defendants failed to continue their educations while they were confined. In essence, the five student plaintiffs contend that the school district defendants' failure to provide them with educational materials in jail resulted in a de facto suspension without notice or a proper hearing.

The school district defendants object to the five student plaintiffs' allegations on the grounds that they had never asserted this claim before their response to the motion for summary judgment. The court has reviewed the complaint and Pretrial Order and concludes that plaintiffs never asserted such a claim. However, even had the five student plaintiffs previously asserted this claim, they fail to support their assertion with any controlling authority. They quote several sections of Kansas statutes dealing with public school discipline and suspension but offer no argument for how Kansas law supports their constitutional claim. The five student plaintiffs also cite and quote case law explaining a student's due process rights, but they do not explain how or if that creates a requirement that school officials provide a confined student with educational material or else risk violating the student's due process rights. At this juncture, absent controlling authority to the contrary, the court dismisses this claim.

The five student plaintiffs next assert several errors in their suspension from LCHS that they claim resulted in the deprivation of their due process rights. The five student plaintiffs contend that

they should have been informed that Heiskell was a witness against them and that they should have been allowed to cross-examine him. As *Watson* makes clear, however, there is no constitutional guarantee to cross-examine witnesses during a school suspension hearing. *See* 242 F.3d at 1242–43 (citing *Gorman,* 837 F.2d at 7, 16). Morever, the suspensions were based upon the existence of the conversation about attacking LCHS, which resulted in substantial disruption of the school and to which the five student plaintiffs admitted, rather than Heiskell's testimony.

The five student plaintiffs also contend that the notices sent to them were insufficient to provide them with notice of the charges against them, a right highlighted by *Goss.* Due process requires that a student be made aware of the charges facing him so that he may prepare a proper defense. Upon review, the notices appear adequate to sufficiently notify the five student plaintiffs of the charges against them. Nevertheless, when, as is the case here, a student is well aware of the subject of a suspension hearing, a facially inadequate notice does not deprive his due process rights. *Watson,* 242 F.3d at 1241. The court concludes that the notice sent to the students satisfied the due process requirements of notice set out in *Goss.*

The five student plaintiffs also assert the their suspensions were improper because they were "based completely upon the school officials' erroneous beliefs that the boys were guilty even after Heiskell recanted his lies and the charges were dismissed." Their contention misses the mark, however, because they are contesting the outcome of the hearings rather than the procedures themselves. The transcript from the hearings reflects that the five student plaintiffs were suspended as a result of the impacts on LCHS of their admitted conversation about attack-

ing the school, not as a result of the criminal charges initially filed or Heiskell's statements. In either case, the five student plaintiffs' claim does not raise a procedural due process claim, and the court's role is not to review the merit of Wilson or Cartwright's decisions. *See Wood,* 420 U.S. at 326, 95 S.Ct. 992.

 The substantive due process claims of the five student plaintiffs also must be dismissed. To maintain a claim for deprivation of due process rights, a student must demonstrate that he suffered substantial prejudice as a result of the inadequate procedures. *Watson,* 242 F.3d at 1242. Traxson already waived his right to a hearing in exchange for the opportunity to obtain his high school diploma through an independent study program. Smith, McReynolds, and Spencer appeared at the hearing with one or more parents and an attorney and agreed to the suspensions. None of these four admitted their guilt with respect to the offense, but because each of them agreed to a suspension either before or at the immediate outset of their hearing, they cannot now claim that their suspension was the result of inadequate procedures.

Vail appeared at his hearing with his grandfather but did not retain counsel. Vail did not acquiesce to his suspension, and Wilson permitted him to present his case. Wilson determined that Vail would be suspended as well, but, again, the court's role is not to evaluate the merit of the decision itself. *See Wood,* 420 U.S. at 326, 95 S.Ct. 992. Defendants provided Vail with proper notice and allowed him to present his case at his hearing, thus preserving his due process rights.

Based upon the court's findings and conclusions above, the court grants Wilson and Cartwright's motion for summary judgment with respect to the five student plaintiffs' claim for deprivation of their procedural and substantive due process rights.

### 2. U.S.D. 506

U.S.D. 506 can only be held liable for unconstitutional acts that are the result of the policy or custom of the school district or from the acts of officials with policy-making authority. Because the court concluded that Cartwright and Wilson did not deprive the five student plaintiffs of their due process rights, the court dismisses their claim against U.S.D. 506.

### J. Deprivation of Substantive Due Process

The five student plaintiffs and Sanders bring a claim for deprivation of substantive due process against the county defendants.

The five student plaintiffs and Sanders did not respond to the county defendants' motion for summary judgment as to this claim. Moreover, as this court already concluded, a malicious prosecution claim under § 1983 implicates the Fourth Amendment, not the Fourteenth. *Smith v. Barber,* 195 F.Supp.2d 1264, 1279 (D.Kan.2002). The five student plaintiffs and Sanders claim against the county defendants is therefore dismissed.

### IV. Plaintiffs' Remaining State Law Claims

Federal district courts have supplemental jurisdiction over state law claims that are part of the "same case or controversy" as federal claims. 28 U.S.C. § 1367(a). The court may decline to exercise supplemental jurisdiction over a claim once it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3) "Generally, when a district court dismisses the federal claims, leaving only supplemented state claims, 'the most common response ... has been to dismiss the state claim or claims without prejudice.'" *Unit-*

*ed States v. Botefuhr,* 309 F.3d 1263, 1273 (10th Cir.2002) (quoting *Ball v. Renner,* 54 F.3d 664, 669 (10th Cir.1995)).

In this case, the court has determined that dismissal of plaintiffs' federal claims is appropriate. Therefore, in the absence of another basis for original jurisdiction, the court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims.

### V. Order

**IT IS THEREFORE ORDERED** that the city defendants' and the school district defendants' Motion for Summary Judgment (Doc. 171) and the County Defendants' Motion for Summary Judgment (Doc. 173) are granted in part. The court dismisses all of plaintiffs' federal claims but does not rule on plaintiffs' state law claims because the court declines supplemental jurisdiction over these claims.

**IT IS FURTHER ORDERED** that this case is hereby dismissed.